E-FILED
Wednesday, 21 March, 2018  11:31:51 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, URBANA DIVISION



FILED

MAR 2 1 2018

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, ILLINOIS

HYE-YOUNG PARK, a/k/a LISA PARK,

**Plaintiff,**

v.

THE BOARD OFTRUSTEES OF THE UNIVERSITY OF ILLINOIS

KAAMILYAH ABDULLAH-SPAN,

MENAH  PRATT-CLARKE, in their individual capacities,

**Defendants.**

Case No:  18-2090

**JURY TRIAL DEMANDED**

# CIVIL RIGHTS COMPLAINT AND DEMAND FOR JURY TRIAL

## SECTION A – OVERVIEW

### I.    JURISDICTION

1.    This Court has jurisdiction over my claims pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1331, and 28 U.S.C. § 1343(3). I further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367.

### II.    PARTIES

2.    Plaintiff, HYE-YOUNG Park, also known as Lisa Park (hereinafter "I"), is a citizen of the Republic of Korea, is a female of Korean national origin, and was, at all times relevant to this Complaint,  a non-immigrant resident of Champaign County, Illinois. I am now a permanent resident of the United States. I allege that my civil rights has been violated by the individual(s) named below.

4

These defendants personally have participated in causing my injury, and I am seeking money damages. I will briefly describe how these defendants have participated in their violation of my civil rights in the IV. STATEMENT OF CLAIM SECTION and therefater.

3.      Defendant #1, BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS (hereinafter "University of Illinois"),  is a body corporate and politic which operates the University of Illinois, including the University of Illinois at Urbana-Champaign (hereinafter "UIUC" or "the University), located in Champaign County, Illinois. (352 Henry Administration Building, MC-350 506 S. Wright St. Urbana, IL 61801.)

4.      Defendant #2 was, at all times relevant to this Complaint, an employee of the University of Illinois, and a resident of Champaign County, Illinois.

Full Name: KAAMILYAH  ABDULLAH-SPAN, (hereinafter "Abdullah-Span")
Current Job Title: Senior Associate Director at the Office of Diversity, Equity, and Access (ODEA)
Current Work Address: 1004 South Fourth Street Champaign, Illinois 61820

5.      Defendant #3 was at all times relevant to this Complaint, an employee of the University of Illinois, and a resident of Champaign County, Illinois.

Full Name: MENAH  PRATT-CLARKE, (hereinafter "Pratt-Clarke")
Current Job Title: Associate Chancellor, Associate Provost for Diversity
Current Work Address: 303 International Studies Building 910 South Fifth Street Champaign, IL 61820
and/or 104 Swanlund Administration Building, 601 East John Street Champaign, IL 61820

## III.    PREVIOUS LAWSUITS

6.      I filed another lawsuit in this court.

While working as a researcher at UIUC after earning my Ph. D, I became a victim of sexual harassment from a colleague, Charles Secolsky. This experience led me to file a lawsuit against the following defendants.

Parties to the previous lawsuit:

5

Plaintiff: Hye-Young Park, a/k/a LISA PARK,

v.

Defendants: MICHAL T.HUDSON; HEIDI JOHNSON, CHARLES SECOLSKY, ROBERT STAKE, in their individual capacities, and THE BOARD OFTRUSTEES OF THE UNIVERSITY OF ILLINOIS,

a.    Date of Filing: June 23, 2015

b.    Case Number: 15-cv-213

c.    Jurisdiction/Court: US DISTRICT COURT CENTRAL DISTRICT OF ILLINOIS, URBANA DIVISION

d.    Name of Judge: Judge, Hon. Colin Stirling Bruce; Magistrate: Hon. Eric I. Long

e.    Issues Raised:

Count XIV:  Discrimination/Hostile Educational Environment, Title IX (Park v. BOT)

Count XV: Denial of Substantive Due Process, 42 U.S.C. § 1983 (Park v. Stake, Hudson, & Johnson)

COUNT XVI. Denial of Substantive Due Process, 42 U.S.C. § 1983 (Park v. BOT)

COUNT XVII. Retaliation, 775 ILCS 5 et seq. (Park v. Hudson and Johnson)

COUNT XVIII. Retaliation, 42 U.S.C. § 1981 (Park v. Hudson and Johnson)

COUNT XIX. Retaliation, 42 U.S.C. § 1981 (Park v. BOT)

COUNT XX. Retaliation, Title IX (Park v. BOT)

f.    Disposition of Case:

As of January 30, 2018, Defendants from the University (Hudson, Johnson, and the Board of Trustees) were terminated as Defendants while the counts against Stake and Secolsky still remains to go to the trial.

g.    Date of Final Disposition: N/A

I am planning to appeal after the final judgement. The court clearly misapplied the law because the facts are deliberately distorted.

In the meantime, **I found new facts and evidence during the discovery (completion date: December 6, 2017),** which is the purpose of filing this lawsuit.

7.    Several staff members were deeply involved in my complaints with the Office of Diversity, Equity, and Access, and they collaborated to dismiss my case.

8.      There was serious abuse of discretion about the facts. Several important facts along with critical points that I addressed were missing in 'Motion for Summary Judgement;' my attorney did not have the time to allow me to look at the filings before submission as he dealt with five parties alone.

9.      I would like to present the important facts and critical points that were missing in the previous lawsuit, so that US federal court can apply the law based on the facts and evidence in order to serve justice.

Once again, I respectfully request that this Court check facts and evidence rigorously to serve justice.

## IV.    STATEMENT OF CLAIM

10.     I, Hye-Young Park, am filing this lawsuit due to the actions (and lack of) from the Office of Diversity, Equity, and Access (hereinafter "ODEA") that excluded me from participating in their services by denying my status at the University of Illinois at Urbana-Champaign at the time of investigation.

11.     In their words chronologically:

> Neither you (I, the plaintiff) nor Mr. Secolsky have [sic] any direct employment or current affiliation with the University of Illinois.

> As I stated earlier, the information I have been able to glean indicates that neither you nor Mr. Secolsky are [sic] employed or currently affiliated with the University. The onus, therefore, would be on you to demonstrate otherwise. Accordingly, and unless you can demonstrate that the inappropriate behavior occurred while you were either employed by or were a student at the University, this office has no jurisdiction over your matter.

> M.T. (Hudson) let Heidi (Johnson) know my (Hudson) thoughts about disposing of this case (my complaint) as soon as possible," and"neither she (I, the plaintiff) nor Secolski [y] have [sic] any status on campus that would warrant an investigation by our office (ODEA).

> Neither party (Secolsky and I) has any affiliation with the University. Accordingly, ODEA has no jurisdiction over this matter (my complaint).

> The ODEA's investigation led to the conclusion that Park (I) was not a student or employee at the University of Illinois at the time of the investigation.

7

**These are False Statements.**

12.      I provided my proof of employment at the University for ODEA and others many times in many ways. **(My Post-Completion OPT is attached, marked as Exhibit A.)**

13.      The ODEA also spread the false statements to others, including Charles (hereinafter "Secolsky"), Robert Stake (hereinafter "Stake"), and Reginald J Alston, who believed the ODEA and passed the same false statements to me and others.

14.      This allowed and emboldened Secolsky to continue engaging in acts of retaliation and other tortious behavior.

15.      The defendants also did not follow their own policy and procedures, which will be discussed in the next section in detail.

16.      On August 13, after I continued to provide ODEA with my F1 OPT documents again, Hudson sent an email with subject line "RE: Reminder-Clarification/**Final**." It says:

"neither you nor Mr. Secolsky are employed or currently affiliated with the University. (...) this office has no jurisdiction over your matter."

On August 14, Julie Misa (hereinafter "Misa"), Director of International Student and Scholar Services (hereinafter "ISSS"), sent Michal T. Hudson (hereinafter "Hudson"), an email confirming my F1 OPT status at UIUC at my request.

On August 15, the very next day, Nancy Abelmann (hereinafter "Abelmann") notified me of her withdrawal of my OPT sponsorship.

17.      Reasonable speculation led me to the conclusion that they engaged in tortious interference with Abelmann's sponsorship; I continued to challenge them. However, Hudson and Heidi Johnson (hereinafter "Johnson"), wanted to get rid of me as soon as possible.

18.      Defendants' interaction with me (meetings, email exchanges, and Informal Resolution Disposition) merely consists of their continuous claim "neither Plaintiff nor Secolsky has any status with the University, and that ODEA therefore had no jurisdiction over my complaint."

They never asked me about my well-being.

8

19.     I filed a lawsuit against Hudson and Johnson on June 23, 2015 (Case No: 15-cv-2136). Hudson and Johnson continue to deny my affiliation with the University to this day.

20.     Discovery against the defendants from the University was completed on December 6, 2017.

21.     I recently found out that not only Hudson and Johnson, but also Abdullah-Span and Pratt-Clarke have been deeply involved in my case from the start. They have conspired together to violate my civil rights.

**Fundamental Issues with the ODEA**

22.     The defendants argue that:

> (1) The alleged harasser, Secolsky, was not an employee of the University, agent of University, or person under the University's disciplinary control.
>
> (2) Even if Dr. Secolsky was deemed an employee of or affiliated with the University, his alleged harassment of Plaintiff is not "state action." Dr. Secolsky had no University-centric relationship with Plaintiff.
>
> (3) Dr. Secolsky and Park collaborated on academic matters and he was Plaintiff's private employer. Dr. Secolsky's alleged conduct, even assuming he was a University employee or otherwise affiliated, was not "under color of state law." Plaintiff's § 1983 claim consequently fails. All of the alleged harassment occurred in the context of Plaintiff's employment and/or academic collaboration and friendship with Secolsky.
>
> (4) All of the alleged harassment occurred off University property. He did not harass Plaintiff at the University. All of the alleged misconduct occurred in Dr. Secolsky's home, Plaintiff's apartment, over the phone, or otherwise outside the University's grounds.
>
> (5) After Secolsky's conduct was brought to the attention of the University, no further sexual harassment occurred. Plaintiff alleges some conduct which she considered to be harassing in nature, but acknowledges that these were small things, and she did not report any of them to the University.
>
> (6) The ODEA's investigation led to the conclusion that Park was not a student or employee at the

> University of Illinois at the time of the investigation.
>
> (7) Secolsky was not a student or employee at the University, was not affiliated with the University of Illinois, was not a third-party for purposes of Title IX, and that ODEA had no jurisdiction over him.

23.     While I will rebut the defendants' claims listed above hereafter, the main issues with the ODEA has little to do with the issues above (e.g., whether what happened is sexual harassment or harassment; whether the harassment occurred on campus or off campus; whether Secolsky was an employee of the University).

24.     The main issue with ODEA is that they knew the following from my first visit to ODEA on June 26:

> (1) I met Stake and visited Women's Resources Center (WRC) to address my issue with Secolsky.
>
> (2) In their word, "Secolsky, whom Complainant alleges continues to inappropriately engage her."
>
> (3) Secolsky sexually harassed me in various ways, which had caused me to see a psychiatrist at Carle. (see pp.15-18 Dr. Note which I provided Hudson on June 26).
>
> (4) Right after showing my F1 OPT documents during my first meeting with Hudson on June 26, 2014, I also sent an email providing her with the documents for future reference which verified I was on a valid F1 OPT at UIUC and my study focused on international students.
>
> (5) Secolsky taught Stake's class and did activities under CIRCE. Stake allowed him to use the titles professor/visiting scholar at CIRCE, UIUC.
>
> (6) Secolsky interacted with numerous U of I employees and students, including professors.
>
> (7) I was involved in several university related academic work with Secolsky from January 2014.
>
> (8) My F1 OPT expiration date was September 30, 2014. Secolsky was about to finalize the H1-visa application to hire me.
>
> (9) Secolsky was about to finalize the H1-visa application to hire me.
>
> (10) I visited Human Resources (HR) to address my issue with Secolsky, Stake, and ODEA.
>
> (Note: Felicia Parks from HR contacted Hudson on July 30, 2014)
>
> (11) I did not sign or submit the Informal Resolution Request Form.
>
> (12) I have continued to engage in professional interactions with Secolsky.

also, the ODEA knew the following later:

(13) Secolsky retaliated.

(14) In their word, "Respondent Secolsky, whom Complainant alleges continues to inappropriately engage her"after I put the defendants on actual notice.

(15) Secolsky continued to teach Stake's class and do activities under CIRCE. Stake allowed him to use the titles professor/visiting scholar at CIRCE, UIUC.

(16) My F1 OPT expired on September 30, 2014 by the time Hudson had a meeting with Johnson on October 13.

25.     ODEA knew everything listed above (Evidence will be provided hereafter), yet Hudson tried to get rid of my case as soon as possible.

"M.T. (Hudson) let Heidi (Johnson) know my (Hudson's) thoughts about disposing of this case as soon as possible."

(Note Hudson referred to herself in 3rd person as "M.T." See below.)

Heidi noted to M.T. that "neither she nor Secolsky have any status on campus that would warrant an investigation by our office."

| | |
|---|---|
| Subject: | Heidi and M.T. |
| Location: | 100 SAB |
| Start: | Mon 10/13/2014 8:30 AM |
| End: | Mon 10/13/2014 9:00 AM |
| Recurrence: | (none) |
| Meeting Status: | Accepted |
| Organizer: | Johnson, Heidi |
| Required Attendees: | Hudson, Michal Thomas (mthdsn@illinois.edu) |

M.T. met with Heidi and provided my insight into the matter.
Heidi said that Park wanted to know what Stake said in meeting, and what our office has done.
M.T. explained to Heidi that I did meet with Stake, and I provided her with answers to questions asked about the meeting.
Heidi asked if something happened on campus and I could not answer in the affirmative, as the situations described by Park took place at Secolski's apartment which is off campus.

Park shared with Heidi that she is putting a video together, and the title has 'Grandpa' in it. Grandpa references Secolski.

M.T. noted that while everyone sees Secolski's behavior as inappropriate, Park's behavior raises questions as well. M.T. let Heidi know my thoughts about disposing of this case as soon as possible.

Heidi noted to M.T. that she has explained our responsibilities to Park, and that neither she nor Secolski have any status on campus that would warrant an investigation by our office.

Heidi said that she will follow up with Park and advise her of closure.

26.     Such behavior from the University added an enormous amount of stress to my already existing stress and anger from Secolsky's sexual harassment.

27.     ODEA still proclaims that "she (Lisa Park) was neither a student nor an employee on the campus." This is a defamatory false statement, which harms my reputation and makes me suffer to this day and in the future as well.

## SECTION B - DESCRIPTION OF WHAT HAPPENED

**Main Characters and Setting**

28.     I, Hye-Young (Lisa) Park, was, at all times relevant to this Complaint, employed by the University of Illinois as a Ph. D researcher with F1 student visa from October 15, 2013 through September 30, 2014.

After earning my Ph. D, I was legally in the United States under an F-1 non-immigrant visa as a participant in the post-completion Optional Practical Training (hereinafter "OPT") sponsored by the University of Illinois.

Although I graduated, I was still considered as a student with F1 student visa from the perspective of the the United States Citizenship and Immigration Services (hereinafter "USCIS"). I was also considered as an employee with OPT from USCIS perspective.



29.      Stake was, at all times relevant to this Complaint, a Professor Emeritus and a resident of Champaign County, Illinois.

At all times relevant to my complaint, Stake was the Director of the Center for Instructional Research and Curriculum Evaluation (hereinafter "CIRCE"), a research center operating under the auspices of the University of Illinois.

30.      Secolsky was, at all times relevant to this Complaint, a Visiting Researcher at CIRCE at the University of Illinois, and a resident of Champaign County, Illinois.

31.      Stake and Secolsky were actively involved in Center for Instructional Research and Curriculum Evaluation (CIRCE) Activities and ESY 490E Case Study Methods during 2013-2014 at UIUC. **(Their activities under CIRCE and ESY 490E class are attached, marked as Exhibit B. Only representative examples are included in Exhibit B due to the immensity of the documents, which are linked on my website.)**

32.       My academic involvement with Secolsky started from sometime during December, 2013. Secolsky and I developed a professional relationship through our mutual acquaintance, Bob Stake, who Secolsky works under. Secolsky offered to work with me in academic activities, including ones related to the University of Illinois. **(The nature of work with Secolsky at UIUC is attached, marked as Exhibit C.)**

In January and February 2014, we already established several university related academic works. We continued to work together until July 28, 2014 when Secolsky and I communicated in relation to the presentation paper at the Culturally Responsive Evaluation and Assessment (hereinafter "CREA"), hosted by the College of Education at University of Illinois.

The CREA presentation was made on September 19, 2014.

My other academic work was still going on until July 31, 2014 when Seocolsky asked me to edit a working publication.

33.      All the work listed with Secolsky in Exhibit C is the usual work that I would do with any other academic. I relied on Secolsky's apparent authority when I interacted with him as I would with any other professor and scholars, discussing academic matters, co-writing grant proposals, conference papers, and publication.

13

I divided Exhibit C into University-based work and other academic work because the defendants argue that "Dr. Secolsky had no University-centric relationship with Plaintiff."

However, it is nonsense to distinguish University-based work from academic work. In academic communities, all of them fall into academic work.

34.     Secolsky suggested hiring me for his company in January, 2014. He told me that he needed a qualitative analyst.

Note that I worked for his company only for two weeks (From July 15, 2014 to July 28, 2014).

Furthermore, even during the two-weeks as an employee, I continued to be involved in my academic University-based relationship with Secolsky as in Exhibit C.

35.     While I was involved in academic works with Secolsky, his sexual harassment began.

There was sexual harassment after I put ODEA and Stake on actual notice on June 21 and June 26 2014. **(The evidence of sexual harassment is attached, marked as Exhibit D).**

The harassment continued until ODEA's "reckless intervention" the ODEA's meeting with Stake on August 4. I will discuss why I call it "reckless" hereafter.

Since then, his harassment turned into his retaliation (e.g. He excluded me from all the academic work that I had collaborated with him).

36.     Hudson, at all times relevant to this Complaint, was employed at the ODEA with the titles of "Senior Title IX and ADA Specialist" and "Assistant ADA-EEO Coordinator" at UIUC.

37.     Abdullah-Span (Hudson's supervisor), at all times relevant to this Complaint, was employed at the ODEA with the title of "Senior Associate Director" at UIUC.

38.     Johnson, at all times relevant to this Complaint, was employed with the title of "Director" of ODEA at UIUC.

39.     Partt-Clarke, at all times relevant to this Complaint, was employed at UIUC with the titles of "Associate Chancellor for Strategic Affairs" and "Associate Provost for Diversity."

14

**(Hereafter, the evidence or fact(s) in individual number below is attached, marked as Exhibit E.)**

**Opening Up**

40.     After conducting my five-year long ethnographic dissertation project, I earned my Ph.D. in August 2013 at UIUC.

Post-graduation, I was determined to get a job in the US so that I could not only give back to the country that has given me diverse opportunities and helped develop my critical thinking, but also to give back to my own country with what I have learned. This was my ultimate dream.

I applied for tenured track positions at top tier universities such as the University of Michigan, Michigan State, Harvard, UT Austin, and Vanderbilt.

41.     However, I did not expect them to hire me right away. I realized that I needed to build up my resume to be able to compete for my desired positions; thus, I decided to extend my research at the University of Illinois through the F1 OPT program, which granted me one year to work on my publications. It was an unpaid OPT because my professors did not have funding. However, I was content with this as I just wanted the legal status while I worked on my publications.

42.     I believed that through this program, where I would collaborate with Dr. Nancy A. Abelmann and Dr. Violet J. Harris on transnational issues in the United States, I would be better prepared to work at a top- tier university. I also planned to apply for an H1 visa in order to work part-time for a few years, which would allow me to publish several articles and books in top journals and publishing companies.

---

F1 OPT: "Optional Practical Training (OPT) is temporary employment that is directly related to an F-1 student's major area of study. Students may work as volunteers or unpaid interns, where this does not violate any labor laws."

H-1B Visa: The H-1B visa allows "companies in the United States to temporarily employ foreign workers in occupations."

NOTE: From the U.S. Citizenship and Immigration Services, during my F1 OPT (10/15/13 - 9/30/14), I was legally still considered as a student with student visa (F1) while being employee as a Ph. D. researcher (OPT).

---

14

**Academic Engagement and Sexual Harassment**

43.      However, unexpected circumstances arose during my one year F1 OPT program at UIUC in 2013-2014.  During my OPT, I attended Robert Stake's class as an observant, where I met Charles Secolsky.

He introduced himself as a visiting scholar at the Center for Instructional Research and Curriculum Evaluation (CIRCE).

44.      During December 2013, Secolsky offered to read my writing draft and mentioned that Stake told him to assist me.  However, after a few sessions, I did not find his feedback helpful so I informed him that I did not need his assistance anymore although I appreciated his help. He kept insisting, however, to the point that it seemed he was begging to help, which I thought was strange.

45.      One day, he asked me for a ride from Willard Airport to his home on the same day as his arrival, which I thought was impolite as it was so sudden. Later, I found out that his place was only a few minute-drive from the airport, which again, I found strange, as he could have easily gotten home without me.

46.      Feeling ominous and worried that he may be receiving wrong signals from me, I clarified several times that I was not sexually interested in him, for example, through email on February 26, 2014, stating that "Although I appreciate your care, I also want to clarify I am not interested in dating with you."

47.      Later, I happened to come across a strange email regarding me.  In his email to Stake after discussing about a conference, Secolsky stated, out of the blue, that "things are working out between Lisa and me" on January 6, 2014.

48.      Although something felt wrong in my gut, there was much to learn from Secolsky which persuaded me to continue working with him.

During January 2014, I established several works with him. He also offered me a part-time job with his company, which would allow me time to publish my work after my OPT expiration-September 30, 2014. In order to hire me, he had to file H1- visa petition.

49.      It was around this time where Secolsky's sexual harassment began.

On January 24, 2014, at Secolsky's business-residence, I was getting ready to go home after our grant proposal was completed. However, he asked me to watch a movie with him, which, he insisted, would

teach me about American culture. I respectfully refused but he insisted, stating that it would take just 15 minutes, which I agreed upon.

This "movie" turned out to be a sexually explicit video which he later described as conventional male-female intercourse, female-male fellatio, and a male "feeling up" a female.

When I asked why he would show me this, he responded, "Asian women like white men."

When I attempted to leave, he blocked me while grabbing my arm and demanding me to watch more.

50.     I told him to stop or I would report this to Stake whereupon Secolsky fell to his knees and begged me for forgiveness, and apologized, explaining that his mother had died early, and that he had been a foster child. He promised me he would never do it again.

I was in shock and felt vulnerable, but I did not want to get him in any trouble and hoped to resolve this issue between the two of us. This was partly due to my upbringing in Korea where we are taught respect and forgiveness.


**Dilemma**

51.     Unfortunately, harassment continued even though I clearly rejected his advances multiple times, leading to serious discomfort. I would tell him to stop and he would apologize.

Ongoing harassment includes his bragging of sexual exploits both with his girlfriend and with a prostitute; asking me to go dancing; requests for kisses; numerous harassing phone calls and voice mails; and attempts to lure me to his apartment under various reasons.

This grew over time to the point where I desperately needed help. However, I didn't look for help as I felt embarrassed and ashamed.

52.     Sexual harassment is often associated with men in a position of power. Victims often do not report cases as they fear retaliation.  I also feared that filing an official complaint would cause Secolsky to retaliate by sabotaging my publications and spreading rumors about me in my field) as he and Stake knew many people in my field.  I also feared that he would jeopardize my H1 visa application.

I was in a dilemma.

53.     Finally, I began to seek outside help: I visited my primary care doctor on March 25, then, I was referred to psychologist (April 9) as well as psychiatrist (May 7). I met Shameen Rakha (June 3), who knows Stake and Secolsky well, to address my issue with Secolsky.

54.     At the advice of my psychiatrist, on June 2, 2014, I contacted Stake at the advice of my psychiatrist, and asked for a meeting to discuss Secolsky's misbehavior.

I met Stake on June 21, 2014, to report Secolsky's sexual misconduct and told him that I was considering legal actions if he would continue to harass me.

 Stake told me that he could not assist me; further, he informed me that:

> a. Secolsky was not associated with CIRCE.
> b. Secolsky was neither employed by nor affiliated with UIUC.
> c. Secolsky was a visiting scholar.
> d. I would lose in court because Secolsky was neither employed by nor affiliated with the university.

After a few minutes of discussion, Stake suddenly told me that he had only five minutes remaining to meet with me. I became angry at Stake's attitude, and told him to "just leave." Stake left, saying, "Sorry I can't help."

55.     Subsequently, I visited Women's Resource Center (WRC) where I was referred to the ODEA.

They said that the ODEA was the place to go to resolve my situation.


**Visiting the Office of Diversity, Equity, and Access (ODEA)**

56.     I first entered the ODEA on June 26, 2014 and, after forwarding the email from WRC and submitting the Intake Questionnaire provided by the office, met with M.T. Hudson, Senior Accessibility Specialist.

I briefed her about my situation including (sexual) harassment from Secolsky.

To prove my valid status at the University of Illinois, I informed her of my F1-OPT status. I also provided documents that show proof of Secolsky's harassment towards me (emails, phone logs, etc.), which she made copies of.

57.    I addressed the crucial situation I was in: I had been working on my academic research with him and he was about to finalize the H1-visa application to hire me through his company—both which would be jeopardized if he decided to retaliate, leaving my fate in his hands.

58.    It seemed as if she understood my situation and passed me an 'Informal Resolution Request Form' (hereinafter "IRRF") to fill out along with a 'Policy and Procedures for addressing discrimination and harassment' for me to keep.



She stated if I wanted to file a complaint, I would have to submit the form. Hudson needed time to look over the documents I provided and suggested I follow up in the near future.

Right after my first meeting with her on June 26, 2014, I sent an email providing her with my F1 OPT documents for future reference.

59.    I met with Hudson for the second time on July 1, 2014.  During the meeting, I repeated what I said during the first meeting-my legal and academic ties with Secolsky and thoroughly expressed my concern about his retaliation if I were to file an IRRF. According to the 'Policy and Procedures (p.6):

(2) Individuals must complete an Informal Resolution Request Form. The IRRF must provide details sufficient to inform and the investigator about the behavior or incident of discrimination and the protected category at issue. ...

The investigator will attempt to achieve a mutually acceptable resolution within 30 days from the receipt of the IRRF.

Any party may pursue a formal investigation if he or she is dissatisfied with a proposed informal resolution.

1. **Informal Resolution Request**
   The investigator who receives a complaint or request for informal resolution will attempt to resolve concerns by informal or collegial processes, including mediation, if the complaining party seeks such assistance.  To request resolution via informal means, individuals must (1) contact the Office of Diversity, Equity, and Access within 180 days following the last occurrence of the behavior or incident of discrimination that is the subject of the informal resolution, and (2) complete an Informal Resolution Request Form. The Informal Resolution Request Form must provide details sufficient to inform the investigator about the behavior or incident of discrimination and the protected category at issue. The investigator will review the request for resolution and determine if the matter is appropriate for informal resolution and whether the allegations set forth in the request form, if substantiated, would constitute a violation of this policy. If not, the investigator will make a referral to an appropriate office.

   If the individual declines to complete the Informal Resolution form, the investigator will either (1) close the matter; or (2) invoke the formal investigation process below if the alleged or suspected misconduct would constitute prohibited discrimination, harassment, or retaliation in violation of this policy.

60.     Hudson informed me that her office wouldn't be able to assist me as Secolsky was not affiliated with the University. Prepared, I pulled out evidence showing his involvement with the University; however, she firmly stuck with her initial statement, which I did not understand.

I told Hudson not to take any further action partly because she informed me that her office couldn't help, but also partly because I did not want Secolsky to retaliate, destroying my hard work and risking my legal status.

Although I did not want to work for Secolsky's company, I thought there's no alternative at the time due to the urgency of securing my legal status.

61.     After my two meetings with her, I directly told Secolsky that I visited the ODEA, but did not file an IRRF. On one hand, I wanted to let him know that if he continued to harass me, I would take legal action. On the other hand, I wanted to assure him that I did not file any official complaint fearing he may retaliate.


**Negligence from ODEA**

62.     However, the sexual harassment continued. Therefore, I emailed Hudson on July 9.

On Wed, Jul 9, 2014 at 8:58 PM, Lisa Park <hpark15@illinois.edu> wrote:

Dear MT:

I would like to ask several questions as follows:

1. I remember you told me that your office won't be able to assist me since Chuck is not officially affiliated with U of I. I would like to clarify this issue.

2. I also remember there is still some assistance from your office in my case. I wonder what kind of assistance is available. Is it possible to open my case again? If so, what might be time limit if there is?

3. If I am eligible to discuss the issues I have raised, would you be willing to set up a meeting at your earliest convenience?

Thank you.

With no response, I sent another one on July 14, requesting for any assistance whatsoever in both emails. On July 16, she responded under my questions,

My Question: I remember you told me that your office won't be able to assist me since Chuck is not officially affiliated with U of I. I would like to clarify this issue.

Hudson: With regard to how we handle these types of cases, whereby we typically contact the Respondent to meet with us, that may not happen in this instance because Selcosky is not affiliated (as best we can tell) with the University. Arguably, therefore, he would not be required to meet with our office.

Q: I also remember there is still some assistance from your office in my case. I wonder what kind of assistance is available. Is it possible to open my case again? If so, what might be time limit if there is?

Hudson: I can certainly meet with the Department, and potentially recommend that they discontinue consulting services with/from Selcosky.

Now that you have put our office on notice, I have an obligation to follow up on this matter.

Q: If I am eligible to discuss the issues I have raised, would you be willing to set up a meeting at your earliest convenience?

Hudson: Upon your response to this e-mail, Kevin will check my availability for a mutually agreed upon time for a 30 minute meeting.

63.     That was not what I wanted; I did not want Stake to "discontinue" Secolsky's CIRCE activity  and his work in Stake's class. I did not want to put him in trouble in a serious manner. I fear retaliation.

Additionally, Stake would not stop having assistance from Secolsky. I knew that. I already met Stake to discuss about my issue on June 21, 2014. But, Stake ignored my complaint.'

I did not want Hudson to recommend Stake to "discontinue consulting services with/from Selcosky" as this would only worsen things, resulting in my demise.

All I wanted was simply to work in a safe environment as other scholars in academia.

64.     Thus, I replied back on July 16:

> Dear MT (Hudson),
>
> So basically, your office **cannot do anything other than "meeting with the Department, and potentially recommend that they** discontinue consulting services with/from Selcosky," right?
>
> **If that is the case,** I do not want to pursue a meeting with you, nor ask your office for a further **reaction in this matter.**

65.     On July 16, Hudson responded:

> My take away from your e-mail is that **you are not satisfied with the answers** I provided.
> I am saddened if such is the case. Nevertheless, I still have an obligation as it relates to inappropriate conduct on this campus. I extend best wishes to you regarding your future endeavors.

66.     Hudson knew I was not satisfied with her answer. Yes, I was not satisfied. Her answer was not what I wanted. I would be in trouble. I was still very much worried about my visa status and all the works that I had with him. So I was angry.

This couldn't be the end.  The next step was to contact someone higher in the chain of command.

67.     Right after receiving the email above, I visited the ODEA to meet Hudson's supervisor but was unable to. To the best of my memory, the door of the ODEA was locked. When I knocked on the door, Kevin, the assistant, came out.

22

Upon my request of meeting Hudson's supervisor, he told me I was not allowed to meet anyone other than Hudson and did not let me in. However, he assured me that he would let Hudson know about my visit. According to Brian Smith (hereafter "Smith"), university attorney, Kevin informed Hudson of the purpose of my visit then.

68.     I also addressed this visit to Dr. Reginald J. Alston (hereafter "Alston"), Associate Chancellor, to explain why I wanted to schedule a meeting with him on August 21 shown below. He forwarded my email to Menah Pratt-Clarke, the Associate Chancellor for Strategic Affairs and the Associate Provost for Diversity at the University of Illinois.

From: Alston, Reginald J
Sent: Thursday, August 21, 2014 12:14 PM
To: Pratt-Clarke, Menah
Subject: Fwd: Update 2 for the Friday meeting--(My identity at the U of I) CONFIDENTIAL

Menah,

See notes below.  Thanks.

Reggie
---
Reginald J. Alston, Ph.D.
Associate Chancellor & Professor
University of Illinois

Begin forwarded message:

> From: Lisa Park <hpark15hpark@gmail.com>
> Date: August 21, 2014, 9:26:30 AM CDT
> To: "Alston, Reginald J" <alston@illinois.edu>
> Subject: Re: Update 2 for the Friday meeting--(My identity at the U of I)
> COFIDENTIAL

Dear Alston,

I dropped by OECD office to arrange a meeting with them other than Ms. Hudson, yet Clerical Assistant Kevin Hobbs informed me that he won't be able to set up a meeting with them. He continued to inform me that Ms. Hudson is the person I should continue with. I have been waiting for her response patiently.

Thank you.

On Thu, Aug 21, 2014 at 9:01 AM, Alston, Reginald J <alston@illinois.edu>
wrote:
Hello Lisa,

ODEA is the appropriate office to address your concerns.  I would strongly recommend that you speak with Director Heidi Johnson at ODEA.  We can still meet tomorrow, but I will rely on advice from Associate Chancellor Menah Pratt-Clarke and Director Johnson.

Reggie

---
Reginald J. Alston, Ph.D.
Associate Chancellor and Professor
University of Illinois at Urbana-Champaign

## Searching for Other Options

69.      Disappointed with the outcome of my visit, but still waiting to hear from Hudson, I immediately started searching for other options to reach for help.

My friend introduced me to Yulee Kim (hereafter "Kim"), Employee Relations Coordinator in the Department of Human Resources (hereafter "HR").

We met on July 23 to discuss my situation against Secolsky, Stake, and the ODEA, as well as a possible position at the University. Yulee Kim advised me to go to the ODEA for a solution.

I even dropped by University of Illinois Police Department and, again, was directed to go to the University for assistance.

I met Kim again on July 30. I noted her again: ODEA told me that they could not assist me.

This time, she urged me to see ODEA ( Kim's meeting note).

Later, I found out Felicia Parks, a staff member from HR, contacted Hudson on July 30 right before my second meeting with Kim.

Back to square one; the verdict was clear—if I were to get any sort of help, it would be only through the ODEA.

70.      I emailed Hudson on July 30 to see if anything had changed since the last time I visited, if it would be any advice or a solution. I was going to ask if I could still file an IRRF.

> Hope this email finds you well. Now I feel I know much more about how to cope with Dr. Secolsky although my psychiatrist advised me to continue to take medication today.
>
> Now, I wonder if there is anything your office can do about the difficulties I have gone through due to the issues I have raised, as you know. Or is there anything your office might recommend or advise me? I think my issue is related to the negligence of the University of Illinois. Thank you for your information in advance.

Days passed slowly as I waited for a response from Hudson.

**Foul, Reckless Intervention and Retaliation**

*Retaliation*

71.     It was Tuesday, August 5, when I received a 'cc'ed email from Secolsky to his immigration lawyer, Susan B. Henner (hereafter "Henner"), who was filing for my H1-Visa. It stated:

> Please hold off on any processing (of my H1-Visa) until I speak to my attorney. NO PROCESSING AT ALL UNTIL I GIVE YOU THE GREEN LIGHT.

My heart jumped in shock before slowly sinking deeper than ever.

On August 4, the H-B visa application was ready to file; Secolsky sent a check for premium processing through overnight mail to Henner.

> NOTE: Even though I did not want to work for his company, I had no other choice at that time due to the time constraint:  I searched for alternative ways, but it was too late to find a position for Fall 2014. My OPT would be over September 30.

I was stuck between a rock and a hard place.

72.     There was only one explanation. The retaliation had begun. The following s are about his statements, in which he admitted his retaliation after he knew Hudson's meeting with Stake.

Upon my question of his sudden H1-B visa application drop, Secolsky emailed:

November 19, 2014:

> It was supposed to be confidential. However, I knew that Bob had spoken to the woman from diversity because it was the same woman who I spoke with when I visited the administration building at the Diversity office. She knew and told me and questioned me about everything you had told her about me.

April 5, 2016:

> (...) because I thought you told lies about me to Diversity office.

25

December 14, 2016: In his Motion for Summary Judgement (#132, p. 32), Secolsky noted:

> It's sad that she probably believed that I still wanted to associate with her.
>
> But, after Robert Stake had received word about the pornography incident and the diversity office at the University of Illinois had been informed of my psychiatrically incited inappropriateness, I no longer had any reason to have anything to do with Dr. Park so that was my reason for not notifying her about anything.

Hudson's meeting with Stake clearly incited Secolsky to stop his H-1B visa processing and fired me.

73.     I emailed Hudson and presented her with the emails I received from Henner and Secolsky and asked her to respond to my previous email and fill me in on anything I missed since our last encounter. I also reminded her about my urgent legal status as in the following two emails on August 6 and August 7.

August 6, 2014, I emailed Hudson:

> On Wed, Aug 6, 2014 at 7:35 AM, Lisa Park <hpark15@illinois.edu> wrote:
> Good morning, MT,
>
> I got a call from Dr. Secolsky which addressed your office and Dr. Stake on Monday, August 4th. I also got emails from Susan (immigration atterny who work with my H1 visa filing in relation to my employment with Dr. Secolsky) and Dr. Secosky. One of emails I have copied your office (attached)
>
> On Tuesday, August 5th, I got an cced email from Dr. Secolsky which has "Please hold off on any processing until I speak to my attorney. NO PROCESSING [H1 visa for Hye Young (Lisa) Park] AT ALL UNTILI GIVE YOU THE GREEN LIGHT."
>
> Would you be willing to respond to my previsous email and update me in the matter of the above?
>
> Thank you for your response in advance.
>
> PS: my insertion "[H1 visa for Hye Young (Lisa) Park"

August 7, 2014, I also added:

> Lisa Park <hpark15hpark@gmail.com>                          Thu, Aug 7, 2014 at 9:06 PM
> To: "Hudson, Michal Thomas" <mthdsn@illinois.edu>
>
> Again,
>
> Just for your information, my visa (F1 with OPT and EAD card) will be expired on 9/30/14 with two month grace period 11/30/12. I already renewed my one year rent. I need H1 visa (either part time or full time) as soon as possible to secure my legal status in the U.S.
>
> Thank you.

*Foul*

74.    Hudson replied back on August 7:

| | |
|---|---|
| **Hudson, Michal Thomas** <mthdsn@illinois.edu><br>To: Lisa Park <hpark15hpark@gmail.com> | Thu, Aug 7, 2014 at 9:22 PM |

Hello Ms. Park –

I have met with Dr. Robert Stake, and my understanding is that neither you nor Mr. Secolsky have any direct employment or **current** affiliation with the University of Illinois. If you have information to the contrary please let me know.

'*. . . Forwarding the Mission of Inclusive Accessibility Across Our Campus*' !!

M.T. Hudson, MSW | Senior Title IX-ADA Specialist

University of Illinois at Urbana-Champaign | Office of Diversity, Equity, and Access

217.333.0885

*mthdsn@illinois.edu*

She met with Bob Stake on August 4th and Secolsky on August 5th without informing me just as I had predicted. I was devastated. It appeared that Hudson took matters into her own hands, without consulting with me as any reasonable person would do.

Hudson neither responded to my ODEA visit on July 16 nor my email on July 30.

Her response did not come until my emails on August 6 and August 7, notifying Secolsky's retaliation.

Also note that Felicia Parks from HR contacted Hudson on July 30 regarding my complaint.

Unknown

| | |
|---|---|
| From: | Microsoft Outlook on behalf of Parks, Felicia A |
| Sent: | Wednesday, July 30, 2014 9:08 AM |
| To: | Hudson, Michal Thomas |
| Subject: | Missed call from Parks, Felicia A |

You missed a call from Parks, Felicia A at fparks@illinois.edu

| | |
|---|---|
| Caller-Id: | fparks@illinois.edu |
| Job Title: | HUMAN RESOURCE REPRESENTATIVE |
| Work: | +1 217 333 0033 |
| E-mail: | fparks@illinois.edu |
| IM Address: | fparks@illinois.edu |

Hudson did not know what my situation was with Stake and Secolsky at that time; what I wanted to accomplish; what are the possibilities; and how we would want to solve the issue, which is the purpose of IRRF. It reads, "What outcome or remedy are you seeking?"

My issues were context-sensitive yet she breached their own rule, which have caused much damage to my career. Again, I did not file or sign the form; *this is foul.*

75.     Suppose I filed the IRRF. Even so, there's a problem of how Hudson conducted her investigation.  The 'Policy and Procedures (p.6) listed "Informal efforts" as follows:

> If the individual declines to complete the Informal Resolution form, the investigator will either (1) close the matter; or (2) invoke the formal investigation process below if the alleged or suspected misconduct would constitute prohibited discrimination, harassment, or retaliation in violation of this policy.
>
> 2.  **Informal Resolution Disposition**
> If the investigator determines that the allegations are sufficient to establish a claim of discrimination, harassment, or retaliation, he/she shall initiate the informal resolution process. The investigator will attempt to achieve a mutually acceptable resolution within 30 days from the receipt of the Informal Request Form. Any party may pursue a formal investigation if he or she is dissatisfied with a proposed informal resolution.
>
> Informal efforts to address the allegations will conclude with one of the following: (1) a resolution of the complaint by agreement of the parties; or (2) a decision to stop further action. Possible resolutions by agreement of the parties may include, but are not limited to: an apology to the initiating party; assisting the responding party to better understand the effects of his or her conduct and ways in which this behavior could be changed; participation in educational programs about equal opportunity or harassment; verbal or written reprimands; or other interventions or actions aimed at ending the alleged misconduct.

Hudson did not do any of them.

76.     Her meeting note with Stake and Secolsky also reveals that they relayed false information about me to Hudson, and Stake denied he kissed me, which he later admitted. There are unverified information and lies on the one-page note, which I can prove. **(The evidence of Stake's amplifying lie is attached, marked as Exhibit F.)**

For example, Hudson's meeting note with Stake states, "Stake said Park was teasing Secolsky with her physical presence, when she went over to his home when he was sick." How did Stake have this information when he wasn't at Secolsky's home on June 21 and when I informed him of Secolsky's harassment on the same day?

Additionally, Hudson admitted that she did not know if Stake was telling the truth. During her deposition, she stated, "I didn't have a sense. That was my first time meeting him."

Similarly, Secolsky relayed false information, most of which he himself proved wrong.

*Reckless Intervention*

77.     Furthermore, there was also a problem of how Hudson conducted her meeting with Stake and Secolsky. Later, I found out that Hudson met Stake in his office, where Secolsky was present, which is reckless intervention.

Secolsky stated, "(Hudson) came to visit Bob, I think about the incident, about Lisa's complaining, about the H-1 visa, about everything, which I had been fearful of. And Bob wasn't allowed to talk to me about it. I think she might have said at that time" (Secolsky deposition, p.13). From the moment I met Hudson, I informed her that Secolsky was using CIRCE rooms and assisted Stake's class.

78.     Additionally, Stake should have known better. He shouldn't have allowed Secolsky to be in the same space, which allowed him to be able to listen to the conversation between Stake and Hudson.

79.     Right after meeting Hudson, Secolsky told me that my complaint did not go anywhere because he heard that I was neither employed by nor affiliated with the University; Hudson must have given him this false information.

80.     Also note that the 'Policy and Procedures (p.4), "will not will not tolerate reprisals or retaliation against persons." Despite that I informed the ODEA of Secolsky's potential retaliation; they did not do anything until October 28. (see below "On October 27 in # 114, finally, Johnson responded" for the

reason why ODEA contacted the College of Education to address issues with Secolsky. Note that by that time, my OPT expired.)

> **B.  Retaliation**
> It is unlawful to retaliate against an individual for opposing practices that discriminate based on a protected class or for filing a discrimination charge, testifying, or participating in any way in an investigation, proceeding, or litigation. Illinois strictly prohibits and will not tolerate reprisals or retaliation against persons due to their assertion of their protected civil rights.

The ODEA's investigation was predestined to fail from the start.


## A Final Reminder from Hudson

81.      After sending Hudson two emails on August 8 and August 13 respectively, Hudson responded with subject line "RE: Reminder-Clarification/Final."  Her answers are under my questions sent on August 8.

> **From Hudson on August 13**
>
> Ms. Park –
>
> I have formulated answers to some of your questions in red. Please scroll down toward the end of this e-mail stream. As I stated earlier, the information I have been able to glean indicates that neither you nor Mr. Secolsky are employed or currently affiliated with the University. The onus, therefore, would be on you to demonstrate otherwise.
>
> Accordingly, and unless you can demonstrate that the inappropriate behavior occurred while you were either employed by or were a student at the University, this office has no jurisdiction over your matter.
>
> On Fri, Aug 8, 2014 at 10:19 AM, Lisa Park
> hpark15hpark@gmail.com wrote:
>
> Good morning MT (Hudson),
> Would you be willing to clarify your understanding of "any direct employment or current affiliation"?

More specifically:

1. What do you mean by "direct employment"? "[D]irect employment" sounds like there is indirect employment. Are there any various forms of employment?

**Hudson: No**

2. What is the operational definition of "affiliation" in the context you brought up? Is there any formal legal definition of "affiliation" based on the articles of the U of I at U-C?

**Hudson: My reference to "affiliation" referred to current employment or visiting staff/faculty at this University.**

3. How does [sic] employment and affiliation are related?

**Hudson: In this context they are not related.**

3 I also would like to know how Bob Stake is related to CIRCE and the University of Illinois in terms of employment and affiliation?

**Hudson: You need to address that question with Professor Stake.**

82.     After that, I emailed Hudson twice on August 13, which includes my question, "Would you be willing to explain what ' this office has no jurisdiction over your matter'?  What does it mean?  Would you be willing to provide me with specific examples or explanation?," **but Hudson did not response ever after.**

**On August 14,** upon my request, Julie Misa, Director of International Student and Scholar Services (here after "ISSS" ) sent Hudson an email proving my F1 OPT status at UIUC.

Misa, Julie B <jmisa@illinois.edu>                                      Thu, Aug 14, 2014 at 12:28 PM
To: "Hudson, Michal Thomas" <mthdsn@illinois.edu>
Cc: hpark15 <hpark15@illinois.edu>

Dear Michal,

I am writing to you to at Lisa (Hye Young) Park's request with information about her status.  Lisa is currently in
F-1 nonimmigrant status through the University of Illinois, Urbana-Champaign.  She is authorized for one year
of post-completion Optional Practical Training (OPT) based on having finished her doctoral degree here.  I
understand that she has been working with Professor Nancy Abelmann during her OPT, but on an unpaid
basis.  Unpaid activities are allowed during OPT, as long as those activities are directly related to the
student's field of study.

Please be in touch if I can provide any additional information.

Sincerely,

Julie Misa, Director
International Student and Scholar Services

**Suspicious Timing**

**On August 15,** the very next day, Abelmann notified me of her withdrawal of my OPT sponsorship. Only the ODEA knew about my OPT sponsorship with Abelmann.



83.     Since then, I emailed Hudson twice asking for an update. I informed her what F1 OPT is with my proof documents and I also informed her of Abelmann's sudden withdrawal, **but Hudson did not response**.

My speculation led me to the conclusion that the pressure by the ODEA forced Abelmann to acquiesce in the ODEA's demand of the withdrawal.

84.     Out of concern that she may have felt bad about her action, on August 17, I sent Abelmann an email with the subject: "No Worries"

85.      She did not respond to my comment that insinuated ODEA's retaliation, which is unusual; she was very friendly and approachable. More than anything else, she had interacted with me through honest and direct communication.

Instead, she informed me on August 18:



> Abelmann, Nancy A <nabelman@illinois.edu>                    Mon, Aug 18, 2014 at 7:31 AM
> To: Lisa Park <hpark15hpark@gmail.com>
>
> I HAVE THE LAWYER LETTER for you in a day..
>
> Nancy Abelmann
> Associate Vice Chancellor for Research – Humanities, Arts, and Related Fields
> Harry E. Preble Professor
>      Anthropology, Asian American Studies, East Asian Languages and Cultures
>
> 404 Swanlund Administration Building, MC-304
> 601 East John Street
> Champaign, Illinois 61820
> (217) 333-5771  fax (217)244-3716
> email nabelman@illinois.edu
> website www.nancyabelmann.com

I could sense something going on. She must have been in a dilemma.

86.      Note that

(1) ODEA only knew my OPT sponsorship with Abelmann.

(2) ODEA and Abelmann's office were in the same building.

(3) Abelmann was on her medical academic leave.

(4) F1 OPT in my case was not allowed to be extended.

(5) Abelmann must have known the impossibility of OPT extension because she had interacted with many international students over many years.

(6) Abelmann did not comment on my implication of ODEA's retaliation.

(7) When Abelmann withdrew her sponsorship of my OPT, it was my responsibility to report to ISSS, which I did on August 19, 2014.

87.     There was also suspicious stuff going on regarding my library account. My library access should have been valid through March 2015. As of March 07, 2014, it was confirmed through University of Illinois System; CITES.

When I request a book through the U of I library system, however, the system notified me that my request of the book "has been cancelled by the interlibrary loan staff for the following reason: Not Affiliated with University."**(Suspicious timing is attached, marked as Exhibit G.)**

88.     On August 19, I emailed Hudson about my unpaid F1 OPT with valid information again.

I was also concerned that Hudson would contact Abelmann, Harris, and/or significant others, which would impact me negatively in academia. I emailed Hudson on August 19:

> Please do not bother Nancy Abelmann and Violet Harris. I do not want my issue with your office, Robert Stake, and Charles Secolsky to cause unnecessary bothersome to them. Thank you for your understanding in advance.

89.     On the same day, I reported to ISSS about Abelmann's withdrawal and substituted her with Harris. Note that ISSS system allows only one sponsor at a time.

Hudson never responded to my continuous F1 OPT updates or other requests on August 13; August 19, twice; August 23, and October 22.


**Near-Death Moment**

90.     Such behavior from the ODEA added an enormous amount of stress to my already existing stress and anger. I thought to myself, 'How could this happen? This is the University of Illinois, one of top-tier universities with a lot of internationals. I was so angry. I couldn't breathe. I felt like I was going to die.'

91.     Realizing the severity of my physical and psychological reaction, I visited the Carle Convenient Care on August 25. I took an electrocardiogram test and the result was not normal.  Randall A Megeff, MD warned me not to drive.

| 216 | 99214-PR OFFICE OUTPATIENT VISIT 25 MINUTES | Megeff, Randall A. MD [0 | 08/25/2014 | 150.00 |

92.    Then, for the first time in my life, I was sent to the emergency room for a heart attack due to the stress.



Jose Ochoa, MD notes:

(The patient) states feel like she has a brick sitting on her chest since Jan.; states she is under a great deal of stress with a school.

Subsequent tests at Carle Heart and Vascular Institute showed that I did not have chronic heart disease. That means the heart attack came from external factors: the stress and shock from my situation.



93.     The note from my psychiatrist reads:

> She describes what sounds like an anxiety attack, where she was seen in convenient care (This refers to the incident above August 25). This occurred when she had to go pick up some papers at an office (CIRCE) where she had been working with a visiting instructor or professor (Secolsky).  She is having some difficulties sleeping these days....

## Retaliation from Secolsky

94.     As I was suffering, Secolsky basically excluded me from all the academic work that I had collaborated with him.

95.     For example, in the revision process of the manuscript we submitted to the Community College Journal of Research and Practice (CCJRP), Secolsky revised it with other authors, and omitted my name.

As Corresponding author, he should have let me know the revision notice from the journal. The email exchange between the journal Representative, Rivka Felsher and Secolsky on September 15 & 16, 2014 is as follows:

36

Felsher:

---

## Community College Journal of Research and Practice   Inbox

☆ rfelsher@fau.edu<rfelsher@fau.edu>                              Mon, Sep 15, 2014 at 8:13 PM
To: csecolsky@gmail.com

Reply | Reply to all | Forward | Print | Delete | Show original

15-Sep-2014

UCJC-2014-0069.R1 - Understanding Student Plans for Transferring from Community College Before
Graduation

Dear Dr Charles Secolsky:

We are in receipt of your revision, however it was not submitted in tracked changes as requested, making
it very difficult for us to determine if all of the reviewers' suggestions for improving the manuscript were
made, despite your cover letter which does not provide a point by point response.

Please send the revision with the tracked changes feature of Word enabled to CCJRP@fau.edu by Friday,
September 19 so that we can continue with the review process.

In addition, we received an email response from Dr. Park and will be updating the manuscript to include
her as third author.

Sincerely,
Ms Rivka Felsher
Community College Journal of Research and Practice

There are now over 1050 Taylor & Francis titles available on our free table of contents alerting service! To
register for this free service visit: www.informaworld.com/alerting.

---

Secolsky:

---

☆ Charles Secolsky<csecolsky@gmail.com>                          Tue, Sep 16, 2014 at 7:00 AM
To: rfelsher@fau.edu

Reply | Reply to all | Forward | Print | Delete | Show original

Dear Rivka,

I am able to resubmit with all track changes by Friday September 19th. Thank you for the extension. One
question I have is whether you want comments as well to indicate where in the manuscript each particular
reviewer's comment has been addressed?

Another question I have is whether you reached out to Lisa Park to see if she was no longer an author or
did she somehow email you first? This is important since she did next to nothing on the manuscript. I no
longer feel she should be an author.

Charles Secolsky
973-489-6472
csecolsky@gmail.com

---

Felsher:

> | Journal of Research and Practice | 9/20/14 10:52 AM |
>
> ☆ Rivka Felsher<rfelsher@fau.edu>    Tue, Sep 16, 2014 at 7:46 AM
> To: Charles Secolsky <csecolsky@gmail.com>
> Reply | Reply to all | Forward | Print | Delete | Show original
>
> Hello Dr. Secolsky,
>
> Your comments need not show exactly how they respond to each reviewer's comments, but that is helpful on longer or more complicated revisions. Since I have been tracking your manuscript, I don't believe that pertains to your paper.
>
> Regarding Dr. Park, I had received an email from you in July asking for Dr. Park to be added as the 3rd author, so Dr. Park emailed me to follow-up to request this had occurred, thus I added her per that summer email.
>
> I can see, however, from your email that things have changed from the original to the revision. I am sorry that our emails crossed.
>
> Given that you have authority as first author, I can remove her, but I highly recommend that you email her to notify her as soon as possible please. It will be your responsibility to manage that communication. Please confirm when you have done so and I will remove her from the articles authorship.
>
> Thank you,
> Rivka

## Thriving

96.      Meanwhile, Secolsky continued teaching Stake's class while interacting with students and scholars at the U of I and doing activities under CIRCE. For example:

> **August 15, 2014**
>
> Secolsky exchanged emails with George Reese, UIUC staff, to discuss about CIRCE activity and publication. (Please note that On August 15, Nancy Abelmann notified me of her withdrawal of my OPT sponsorship.)
>
> **August 18, 2014**
>
> Stake joined Secolsky and George for a meeting.8-18-14-meeting for Bradley University for tomorrow

**August 21, 2014**

Stake informed students in his class that he would be assisted by  Secolsky: 8-21-14-CS as an instructor for RS's case study class

Secolsky was listed as an instructor in the EPSY 490E (Case Study Methods) for 2014. 490E course description, Fall 2014

**September 2014**

Secolsky used the University facilities.

He taught in Stake's case study class.

He interacted with a student on Stake's behalf.

He applied for a position at the U of I as an Information Specialist

I heard that Secolsky was in the class until he left at the end of November 2014.

---

**Attempting to reach out to a Higher Authority**

97.     As I mentioned briefly above, in order to meet Hudson's supervisor, I emailed Alston, the Associate Chancellor, on August 16. I met him on August 22 to discuss my issue with ODEA. **He told me that he heard that I had no status at the University.**

98.     Later, I found out that Abdullah-Span, Hudson's superior, informed Alston through the email below that "Further, our review of University systems does not show that Ms. Park has a current affiliation with the University.... ODEA does not have jurisdiction to respond to Ms. Park's allegations."

39

August 21:

---

**Unknown**

| | |
|---|---|
| From: | Alston, Reginald J |
| Sent: | Friday, August 22, 2014 12:25 AM |
| To: | Abdullah-Span, Kaamilyah |
| Cc: | Pratt-Clarke, Menah; Johnson, Heidi; Hudson, Michal Thomas |
| Subject: | Re: Update 2 for the Friday meeting--(My identity at the U of I) CONFIDENTIAL |

Hello Kaamilyah,

Thanks for sharing the information. I'll keep you informed of my discussions with Ms. Park.

Reggie

---
Reginald J. Alston, Ph.D.
Associate Chancellor & Professor
University of Illinois

On Aug 21, 2014, at 11:40 PM, "Abdullah-Span, Kaamilyah" <kabdulla@illinois.edu> wrote:

Hi Reggie,

I wanted to send you a brief summary of ODEA's involvement with Ms. Park. Ms. Park contacted ODEA a few weeks ago with allegations of inappropriate contact with an individual, who by all accounts, appears to have no relationship with the University. Ms. Park reports that an emeritus professor with whom she has worked recommended that she contact this individual for assistance with extending her visa status. It does not appear that this individual is providing any University-related service or assistance to Ms. Park. Further, our review of University systems does not show that Ms. Park has a current affiliation with the University. Due to these two factors - no known relationship with the University for either Ms. Park nor the individual against whom she's lodging her complaint - ODEA does not have jurisdiction to respond to Ms. Park's allegations. As such, we have advised Ms. Park to sever the relationship with the individual with whom she has concerns.

M.T. has been the individual in our office who has been in contact with Ms. Park. If you have any questions or need any additional information based on the information on the information that Ms. Park has provided to you, please do not hesitate to contact M.T.

Thanks,
*Kaamilyah*

---
From: Alston, Reginald J
Sent: Thursday, August 21, 2014 12:14 PM
To: Pratt-Clarke, Menah
Subject: Fwd: Update 2 for the Friday meeting--(My identity at the U of I) CONFIDENTIAL

Menah,

Park-00434

See notes below. Thanks.

---

Note that my record was shown under the ISSS system because I was on F1 OPT (I was an international students/employee). By the time Abdullah-Span informed Alston, as a Hudson's supervisor, she should have known about my unpaid F1 OPT.

99.     Finally, I was able to contact Heidi Johnson thanks to Alston. I emphasized that I had not given the ODEA any permission to pursue informal nor formal investigation, as well as I did not want this to further affect my academic career in a negative way.

---

**RE: Request a confidential meeting from Hye Young (Lisa) Park**
10 messages

Lisa Park <hpark15@illinois.edu>                                        Fri, Aug 22, 2014 at 5:06 PM
To: johnso19@illinois.edu
Cc: "Alston, Reginald J" <alston@illinois.edu>, Hudson Michal <mthdsn@illinois.edu>

Dear Director Heidi Johnson:

I am Hye Young Park. My status is F1 OPT through the U of I. At the advice of Dr. Alston, I formally request a meeting with you.

I have been waiting for a response from Ms. Hudson as to the issues I have raised. I have already provided Ms. Hudson with the documents that are related to my legal status in the United States.

Please be advised that I have not given your office any permission to pursue informal nor formal investigation. I have persistently pursued my academic career for the last 14 years in the U.S. alone. Please keep it confidential. I do not want this to further affect my academic career in a negative way.

Thank you for your consideration.

Sincerely,

---

100.     On August 22, I emailed Johnson and 'cc' ed to Alston and Hudson.

---

Lisa Park <hpark15hpark@gmail.com>                                      Fri, Aug 22, 2014 at 6:27 PM
To: Heidi Johnson <johnso19@illinois.edu>
Cc: "Alston, Reginald J" <alston@illinois.edu>, Hudson Michal <mthdsn@illinois.edu>

Dear Heidi Johnson:

I have decided to do one at a time.

Now, the most urgent thing becomes my NIW petition to USCIS.
I would like to have a meeting with you after filing the NIW petition.
Serous time constraint is involved in the petition.

Since you have my identity documented, in the proposed meeting, I would like to discuss the topics surrounding:

1) the identity of Office of Diversity, Equity, and Access (ODEA)
2) Negligence of the U of I.
3) My human right.

I will get back to you soon after filing the petition.

Thank you.

---

101.     On August 23, I requested a meeting with Johnson. However, I was forced to delay the meeting because I had to take care of my legal status; my OPT was going to expire on September 30, 2014.  In order to continue my career and my life in the US, I had to file a green card petition which took time.

**Dispose of my case ASAP**

102.    It wasn't until I finally met Johnson on October 1st where I filled her in with my situation and raised the issues between me and Secolsky, Stake, and the ODEA.

I also showed her the documents of my F1 OPT status at the university that I had provided Hudson with several times. These documents also were already provided to Johnson on August. 23, 2014.

103.    However, she repeated the same thing as Hudson stated, "neither she (Lisa Park) nor Secolski [y] have any status on campus that would warrant an investigation by our office."

Therefore, I emailed Johnson **eleven times** to provide her with the proof about my F1 OPT by forwarding two emails from ISSS and the **Ten** attachments, which I provided Hudson.

However, Johnson sent me **only two** emails (10/10/14;10/13/14), which merely stated that she would update me.

104.    My OPT documents sent to Johnson:

---

10/1/14: Julie Misa from the ISSS sent an email verifying my status at the university. I forwarded this email to Hudson.

10-1-14-My OPT Confirmation from Misa (ISSS)

10/1/14: I sent my status records with 10 attachments

10-1-14-My OPT Proof-Ten Document

10/1/14: I forwarded the email about my status confirmation from Alex Hall, ISSS.

10/1/14-Alex Hall from ISSS

---

105.    During the time frame of my eleven emails sent to Johnson, there was a meeting between Hudson and Johnson on October 13.

| | |
|---|---|
| Subject: | Heidi and M.T. |
| Location: | 100 SAB |
| Start: | Mon 10/13/2014 8:30 AM |
| End: | Mon 10/13/2014 9:00 AM |
| Recurrence: | (none) |
| Meeting Status: | Accepted |
| Organizer: | Johnson, Heidi |
| Required Attendees: | Hudson, Michal Thomas (mthdsn@illinois.edu) |

M.T. met with Heidi and provided my insight into the matter.
Heidi said that Park wanted to know what Stake said in meeting, and what our office has done.
M.T. explained to Heidi that I did meet with Stake, I provided her with answers to questions asked about the meeting.
Heidi asked if something happened on campus and I could not answer in the affirmative, as the situations described by Park took place in Secolski's apartment which is off campus.

Park shared with Heidi that she is putting a video together, and the title has 'Grandpa' in it. Grandpa references Secolski.

M.T. noted that while everyone sees Secolski's behavior as inappropriate, Park's behavior raises questions as well. M.T. let Heidi know my thoughts about disposing of this case as soon as possible.

Heidi noted to M.T. that she has explained our responsibilities to Park, and that neither she nor Secolski have any status on campus that would warrant an investigation by our office.

Heidi said that she will follow up with Park and advise her of closure.

106.    Note that:

(a) Hudson did not "provided her (me) with answers to questions asked about the meeting." She and I only discussed my status.

(b) Hudson "could not answer in the affirmative" when Heidi asked if something "happened on campus."

(c) I provided Johnson a video clip, which shows Secolsky's ongoing harassment.

(d) Hudson wanted to get rid of right away. "M.T. (Hudson) let Heidi (Johnson) know my thoughts about disposing of this case as soon as possible."

(e) Heidi noted to M.T. that "neither she (I) nor Secolski have any status on campus that would warrant an investigation by our office."

**Conflicting Claims**

107.    Hudson, Johnson, and Abdullah-Span continue to deny my status at the U of I. However, evidence shows that they already knew I was on F1 OPT through the university:

(1) I provided Hudson with proof of my F1 OPT many times since my first meeting with Hudson.

(2) Julie Misa from ISSS also sent an email verifying my status on August 14.

Note that the ODEA  building faces the ISSS building.

Additionally, Alston's office, Abelmann's office, and the ODEA were in the same building.

One can speculate they were able to frequently discuss my situation.

---

**Unknown**

| | |
|---|---|
| From: | Misa, Julie B |
| Sent: | Thursday, August 14, 2014 12:29 PM |
| To: | Hudson, Michal Thomas |
| Cc: | hpark15 |
| Subject: | Lisa Park update |

Dear Michal,

I am writing to you to at Lisa (Hye Young) Park's request with information about her status.  Lisa is currently in F-1 nonimmigrant status through the University of Illinois, Urbana-Champaign.  She is authorized for one year of post-completion Optional Practical Training (OPT) based on having finished her doctoral degree here.  I understand that she has been working with Professor Nancy Abelmann during her OPT, but on an unpaid basis.  Unpaid activities are allowed during OPT, as long as those activities are directly related to the student's field of study.

Please be in touch if I can provide any additional information.

Sincerely,

Julie Misa, Director
International Student and Scholar Services
University of Illinois at Urbana-Champaign
400 Student Services Building
610 E. John
Champaign, IL  61820
(217) 333-1303 - phone  (217) 244-0530 - fax
jmisa@illinois.edu  http://isss.illinois.edu/

(3) Hudson and Misa had a conversation at the ODEA about my status on August 18.

---

**Unknown**

| | |
|---|---|
| Subject: | Misa conversation |
| Location: | M.T.'s Office |
| Start: | Mon 8/18/2014 11:00 AM |
| End: | Mon 8/18/2014 11:30 AM |
| Recurrence: | (none) |
| Organizer: | Hudson, Michal Thomas |

M.T. spoke with Julie Misa. The following are points of take away:
- ✓ Park attended a CIRCE Thailand Seminar in April 2014.
- ✓ Still on University of Illinois campus
- ✓ Immigration (F1) status
- ✓ One year practical training   (Organizing Workshop)
- ✓ Arrangement with Nancy Ablemann > Volunteer basis > could be paid activity 20-24 hours > using the U. of I. as employer.
- ✓ Steve Anderson/legal
- ✓ (Working on a volunteer basis, but using the U of I as employer.
- ✓ Policy statement regarding Labor Law
- ✓ M.T. mentioned potentially scheduling a meeting with Julie and legal to discuss what next steps might be.

---

(4) On August 19, I provided Hudson with the information about unpaid OPT.

(5) On August 23, I also provided Hudson, Johnson, and Alston information about my unpaid OPT.

(6) On August 25, Hudson forward Julie Misa's email to Johnson and Abdullah-Span.



Nevertheless, Hudson, Johnson, and Abdullah-Span have continued to deny my affiliation with the University even to this day.

108.    After raising issues at many times and in many ways, on October 21, 2014, Johnson, Director of ODEA, sent an Informal Resolution Disposition signed (by Hudson, dated October 21). I found another version of the ODEA report dated on 10/17/14:



It reads "neither party (Secolsky and I) has any affiliation with the University. Accordingly, ODEA has no jurisdiction over this matter (my complaint)."

109.    I'm also curious as to how they were able to provide the report because I did not sign the document (Informal Resolution Request Form) which Hudson asked me to bring if I wanted to file the form. Again, the'Policy and Procedures (p.6) reads "from the receipt of the Informal Request Form."

> 2.  **Informal Resolution Disposition**
> If the investigator determines that the allegations are sufficient to establish a claim of discrimination, harassment, or retaliation, he/she shall initiate the informal resolution process. The investigator will attempt to achieve a mutually acceptable resolution within 30 days from the receipt of the Informal Request Form. Any party may pursue a formal investigation if he or she is dissatisfied with a proposed informal resolution.

110.    I didn't even know if I was eligible to submit my IRRF because she firmly stated the ODEA couldn't do anything because Secolsky and I were neither affiliated with nor employed by the University.

However, ODEA Informal Resolution Disposition dated on October 21 reads, I "submitted an Informal Resolution request to ODEA":



Therefore, I sent Johnson an email questioning if I was even eligible to request an informal/formal resolution on Oct. 21.

> Dear Director Heidi Johnson:I have looked over the report you have provided. I have one question for now: Was I eligible to request an informal/formal resolution? If then, how so?

111.    They did not do any of the followings listed in their own policy and procedures:

> Informal efforts to address the allegations will conclude with one of the following: (1) a resolution of the complaint by agreement of the parties; or (2) a decision to stop further action. Possible resolutions by agreement of the parties may include, but are not limited to: an apology to the initiating party; assisting the responding party to better understand the effects of his or her conduct and ways in which this behavior could be changed; participation in educational programs about equal opportunity or harassment; verbal or written reprimands; or other interventions or actions aimed at ending the alleged misconduct.

112.    Note also that I did not receive ODEA Informal Resolution Disposition until October 21. Stake and Secolsky did not receive it, either. The Policy and Procedures (p.6) reads:

> In concluding the informal resolution phase, the investigator shall submit a report to the parties involved in the allegation and the appropriate executive officer if necessary, but not normally to any other campus-level office. Informal resolution reports will usually be brief. Reports prepared by an investigator, and all records collected during the investigation, shall be kept separate from the official personnel files of the parties.

**Collaboration against Me**

113.    Later, I found out that several people were involved with regards to the ODEA Report in October; Kaamilyah Abdullah-Span ordered Hudson to write the report, and Phyllis Lashun Tate assisted Hudson with the first report.

2:15-cv-02136-CSB-EIL   # 125-9    Page 56 of 61

Hudson, Michal Thomas

| | |
|---|---|
| From: | Abdullah-Span, Kaamilyah |
| Sent: | Monday, October 13, 2014 2:05 PM |
| To: | Hudson, Michal Thomas |
| Cc: | Tate, Phyllis Lashun |
| Subject: | Lisa Park |

Hi M.T.,

Please work with Phyllis to draft a *brief* informal resolution report of Ms. Park's concerns and the response(s) from Stake and Secolsky (sp?). The report should not exceed one page and needs to only include Ms. Park's concerns, what you learned from your meetings with Stake and Secolowski, and your conclusion.

Thanks,
*Kaamilyah*

114.    Abdullah-Span also was involved in drafting ODEA Informal Resolution Disposition #2, dated on November 26.

| Unknown | |
| --- | --- |
| From: | Abdullah-Span, Kaamilyah |
| Sent: | Friday, October 31, 2014 2:17 PM |
| To: | Hudson, Michal Thomas |
| Cc: | Johnson, Heidi |
| Subject: | RE: PARK |

M.T.,

Please prepare a draft letter and I will provide feedback.

Thanks,
Kaamilyah

115.    Abdullah-Span also knew that I kept asking for follow-up on December 4, 2014 through the emails Johnson forwarded to her.

Several staff members were involved in my complaints with the ODEA and they collaborated to dismiss my case. The documents filed by the University show that the University has rich resources: legal counsels from the Office of University Counsel, attorneys, editors, and staff members with legal and administrative expertise.

Evidence was deleted at the request of defendant's attorney on my website.

Note: I had a proof, but I was informed that the defendants' attorney asked me to remove it because the evidence was protected from disclosure based on the attorney-client privilege.  It seems that this was inadvertently disclosed during the discovery.

116.    Legal counsels at the University and third-party attorneys have vigorously fought for the dependents, Hudson and Johnson.

The dependents have been protected by state's sovereign immunity. The ODEA employees don't seem to care as my situation does not affect them in any way shape or form.

49

They have nothing to lose—the employees do not need to pay when they lose the lawsuit, they are not hurt physically or mentally and they will return to work the next day as if nothing happened.

## The First ODEA Informal Resolution Disposition, H1 Renewal?

117.     I found several errors in the ODEA Informal Resolution Disposition dated on October 21, including false information about H1 visa renewal. Even after I provided my F1 OPT documents numerous times, they claimed that I had H1 visa, not F1 OPT.

ODEA stated:

> Complaint alleged that her international student status, with an H1 Visa, required that the Visa be renewed in order for her to remain in the United States and continue her research.

118.     I responded:

> I did NOT allege that my international student status, with an H1 Visa, required that the Visa be renewed in order for me to remain in the United States and continues my research. I alleged that my status from Oct 15, 2013 to September 30, 2014 was F1 OPT through U of I unpaid employment.

119.     On Oct 22, 2014, I emailed Johnson again that includes my response to the ODEA Informal Resolution Disposition:

> Dear Director Heidi Johnson:
>
> On Oct. 21, 2014, You (the ODEA) have provided one-page written report concerning my case as a follow-up of Oct. 1, 2014 meeting. Attached is my response to the written report. I am eager to hear your response any soon. Sincerely,

120.     In the response, I further asked:

> At this time of writing, I have several questions:
>
> - On what basis, did you write the report? Would you substantiate what I pointed out "not right"?

- You mentioned that I was neither employed by and nor affiliated with U of I at the time of the incidents that I have complained. What is your position in this matter?
- Did I submit the informal resolution officially? Did I fill out the form to allow the informal resolution?
- I showed the evidences that Secolsky has been involved in U of I activities including acting instructor on Stake's behalf at least until September 2014.
- I also showed the evidences that Stake gave Secolsky a permission to use visiting scholar and visiting professor at CIRCE at the U of I.
- While numerous evidence has been staring right in front of your face, how can you support your allegation that Secolsky "has no exiting affiliation or formal interaction with the University.
- I believe that the statement clearly shows you negligence and lack of accountability. What would you say about it?

121.    Johnson did not answer on the issues with the report. This was very infuriating. On October 26, I raised the issues with the ODEA again. In the email, I included many significant people including ones at the University.

**On October 27, Johnson finally responded, but rather than responding to my issues with ODEA, she only asked me to send the information on Secolsky, which I already provided several times.**

October 27, Johnson's request.  On the same day, I provided information about Secolsky with  six attachments which I already provided the ODEA repeatedly.

Note that ODEA contacted the College of Education based on the information about Secolsky I provided repetitively since my first visit to ODEA on June 26.

By the way, it is THEIR job to search for the information about Secolsky. (It should also be noted that ODEA did not investigate Secolsky's ongoing activities at the University until the end of October with the information I provided on October 27. See below for Hudson's email to Abdullah-Span on October 31).

From: Hudson, Michal Thomas
Sent: Friday, October 31, 2014 11:31 AM
To: Abdullah-Span, Kaamilyah
Cc: Johnson, Heidi
Subject: PARK
Importance: High


Great Morning Kaamilyah --

Heidi and I just met with the College of Education regarding the above subject matter.
Dean Mary Kalantzis is interested in getting letters out to Stake and Secosky today, if possible. She has asked us to
provide verbiage for the letters.

The letter to Stake should address the inappropriate action, per an e-mail of April 30, 2014 (see attached) giving
Secolsky          permission to use the title of 'Professor, visiting CIRCE, Illinois' in affiliation with the
University of Illinois, when he in fact has no affiliation with the University.

The letter to Secolsky should address the illegality of him feigning an affiliation with the University, and if possible
noting that charges could be brought against him. I am also attaching a LinkedIn pdf of August 19, 2014, where
Secolsky uses the title of Staff Associate with the University of Illinois at Urbana-Champaign.
In totality, the letters should include verbiage to cease and desist using the University of Illinois name. Any verbiage
assistance/guidance you can offer will be appreciated.


<< File: Professor Visiting CIRCE.JPEG >>  << File: 2-charles Secolsky LinkedIn.pdf >>

'. . . Forwarding the Mission of Inclusive Accessibility Across Our Campus' !!

M.T. Hudson, MSW | Senior Title IX-ADA Specialist
University of Illinois at Urbana-Champaign | Office of Diversity, Equity, and Access
Swanlund Administration Building | 601 East John Street | Champaign, Illinois 61820
217.333.0885 (office) | 217.244.9136 (fax)
mthdsn@illinois.edu
diversity.illinois.edu

122.     Again, after I sent the information Johnson requested, she did not respond. Again, very
infuriating. I copied the email on October 26, pasted, and sent this email to significant others including
ones at the U of I on November 10, 2014. Funny enough, Johnson responded the very next day by
suggesting a meeting.


**Second Meeting**

123.     Finally, I was able to meet with her again on November 18, our second meeting since October 1.

After the meeting, I emailed her with our meeting summary and my response to the ODEA Informal
Resolution Disposition. In the email on November 19, I requested:

> Dear Director, Heidi Johnson:
>
> Thank you for the meeting yesterday (November 18, 2014 meeting). During the meeting, I requested ODEA provide an apology, a rewritten (corrected) report, and compensations. I also requested you to do ODEA staff training about the issues raised during the meeting. You, the Director of ODEA agreed them and expressed you would arrange a legal counsel for the compensations.

Johnson responded on the same day:

> Lisa, Please note that I did not agree to provide you with an apology, a rewritten report, training, and/or compensation. When we met yesterday you requested those items but I did not agree to them. I wanted to make sure that I clarified this misunderstanding.

## The ODEA Second Informal Resolution Disposition, H1 renewal?

124.     Since then, I sent Johnson six emails up to December 1, asking for her follow-up, before she sent me her last email on December 4 which has the second ODEA Informal Resolution Disposition dated November 26.

It still reads, "a renewal of her H1 Visa" without mentioning my F1 OPT even after repeatedly provided evidence, informing that I did not have the H1 Visa.

> **Complainant's Allegations**
>
> Complainant stated that she earned her Ph.D. from the University of Illinois at Urbana-Champaign in August 2013. Complainant alleged that her international student status, with an H1 Visa, required that the Visa be renewed in order for her to remain in the United States and continue her research. Complainant asserted that in one isolated instance, Respondent Stake a former instructor kissed her on the lips. Complainant further alleged that Respondent Stake introduced her to Respondent Secolsky. Complainant developed a professional relationship with Respondent Secolsky, whom she says offered to support her research and assist her in securing a renewal of her H1 Visa. Complainant stated that during her

Note that ODEA removed "On June 26, 2014, Hye Young (Lisa) Park (Complainant), **submitted an Informal Resolution request** to the Office of Diversity, Equity, and Access (ODEA)" and replaced it with "On June 26, 2014, Hye Young (Lisa) Park (Complainant), **met with the Office of Diversity, Equity, and Access (ODEA).**"

Dated October 21, 2014

> **Informal Resolution Disposition – Unresolved**
>
> **Background Information**
>
> On June 26, 2014, Hye Young (Lisa) Park (Complainant), submitted an Informal Resolution request to the Office of Diversity, Equity, and Access (ODEA). Pursuant to the *Policies and Procedures for Addressing Discrimination and Harassment*, Complainant alleged that she has been subjected to sexual harassment based upon race.

Dated November 26, 2014

> Office of Diversity, Equity, and Access
>
> 100 Swanlund Administration Building
> 601 East John Street
> Champaign, IL 61820
>
> 
>
> **Informal Resolution Disposition – Unresolved**
>
> **Background Information**
>
> On June 26, 2014, Hye Young (Lisa) Park (Complainant), met with the Office of Diversity, Equity, and Access (ODEA). Pursuant to the *Policies and Procedures for Addressing Discrimination and Harassment*, Complainant alleged that she has been subjected to sexual harassment based upon race, and she requested that ODEA pursue an Informal Resolution of her allegations.

## Defamatory False Statement

125.     ODEA knew everything listed below, yet Hudson tried to get rid of my case as soon as possible by proclaiming their defamatory false statement:

"The ODEA's investigation led to the conclusion that Park was not a student or employee at the University of Illinois at the time of the investigation."

Again, to recap, ODEA knew from my first visit to ODEA on June 26 that:

> (1) I met Stake and visited Women's Resources Center (WRC) to address my issue with Secolsky.

(2) "Secolsky, whom Complainant alleges continues to inappropriately engage her (me)."

(3) Secolsky sexually harassed me in various ways, which had caused me to see a psychiatrist at Carle. (see pp.15-18 Dr. Note which I provided Hudson on June 26).

(4) Right after showing my F1 OPT documents during my first meeting with Hudson on June 26, 2014, I also sent an email providing her with the documents for future reference which verified I was on a valid F1 OPT at UIUC and my study focused on international students.

(5) Secolsky taught Stake's class and did activities under CIRCE. Stake allowed him to use the titles professor/visiting scholar at CIRCE, UIUC.

(6) Secolsky interacted with numerous U of I employees and students, including professors.

(7) I was involved in several university related academic work with Secolsky.

(8) My F1 OPT expiration date was September 30, 2014. Secolsky was about to finalize the H1-visa application to hire me.

(9) Secolsky was about to finalize the H1-visa application to hire me.

(10) I visited Human Resources to address my issue with Secolsky, Stake, and ODEA.

(Note: Felicia Parks from HR contacted Hudson on July 30, 2014)

(11) I did not sign or submit the Informal Resolution Request Form.

(12) I have continued to engage in professional interactions with Secolsky.

also, the ODEA knew the following later:

(13) Secolsky retaliated.

(14) "Respondent Secolsky, whom Complainant alleges continues to inappropriately engage her" after I put the defendants on actual notice.

> (15) Secolsky continued to teach Stake's class  and do activities under CIRCE. Stake allowed him to use the titles professor/visiting scholar at CIRCE, UIUC.
>
> (16) My F1 OPT expired on September 30, 2014 by the time Hudson had a meeting with Johnson on October 13.

## Title IX Coverage

126.     While ODEA has continued to claim "Neither party (Secolsky and I) has any affiliation with the University. Accordingly, ODEA has no jurisdiction over this matter (my complaint)" to this day, the UIUC 'Policy and Procedures (p.1) reads: "No Illinois student, faculty, staff, applicant, or visitor shall be excluded from participation" and "Discrimination is prohibited in all contexts at Illinois."

> A. **Overview of Prohibited Acts**
> Illinois is committed to ensuring that its learning and working environments are free from all forms of discrimination and harassment.
>
> This policy is designed to promote a safe and healthy learning and work environment and to comply with multiple laws that prohibit discrimination, including: Title VI of the Civil Rights Act of 1964, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act Amendments Act, the Rehabilitation Act of 1973, the Age Discrimination in Employment Act of 1967, the Age Discrimination Act, Title IX of the Education Amendments Act of 1972, the Pregnancy Discrimination Act of 1978, the Uniformed Services Employment and Re-employment Act, the Veterans' Readjustment Act of 1974, the Genetic Information Nondiscrimination Act of 2008, and the Illinois Human Rights Act.
>
> 1. **Discrimination:** No Illinois student, faculty, staff, applicant, or visitor shall be excluded from participation in, be denied the benefits of, or be subjected to disparate treatment in connection with any Illinois service, program or activity on the basis of any of the following protected categories: race, color, religion, sex, pregnancy, disability, national origin, citizenship status, ancestry, age, order of protection status, genetic information, marital status, sexual orientation including gender identity, arrest record status, military status, and unfavorable discharge from military service.

**Additionally, according to United States Department of Education, Office for Civil Rights (Dear Colleague Letter, pp. 4-5):**



### UNITED STATES DEPARTMENT OF EDUCATION

OFFICE FOR CIVIL RIGHTS

THE ASSISTANT SECRETARY

April 4, 2011

Title IX protects students from sexual harassment in a school's education programs and activities. This means that Title IX protects students in connection with all the academic, educational, extracurricular, athletic, and other programs of the school, whether those programs take place in a school's facilities, on a school bus, at a class or training program sponsored by the school at another location, or elsewhere. For example, Title IX protects a student who is sexually assaulted by a fellow student during a school-sponsored field trip.

Title IX also protects third parties from sexual harassment or violence in a school's education programs and activities. For example, Title IX protects a high school student participating in a college's recruitment program, a visiting student athlete, and a visitor in a school's on-campus residence hall. Title IX also protects employees of a recipient from sexual harassment.

Title IX protects students from sexual harassment in a school's education programs and activities. This means that Title IX protects students in connection with all the academic, educational, extracurricular, athletic, and other programs of the school, whether those programs take place in a school's facilities, on a school bus, at a class or training program

(...)

Page 4 – Dear Colleague Letter: Sexual Violence

sponsored by the school at another location, or elsewhere. For example, Title IX protects a student who is sexually assaulted by a fellow student during a school-sponsored field trip.[11]

[11] Title IX also protects third parties from sexual harassment or violence in a school's education programs and activities. For example, Title IX protects a high school student participating in a college's recruitment program, a visiting student athlete, and a visitor in a school's on-campus residence hall. Title IX also protects employees of a recipient from sexual harassment. For further information about harassment of employees, see *2001 Guidance* at

**No Response since Then**

127.    After receiving the second Informal Resolution Disposition, I sent her emails asking questions while providing additional materials as below.

---

12/04/14: provide more info.

12/04/14: provide additional info.

12/04/14: provided Secolsky's identity

12/09/14: Update request

12/09/14: Update request

12/16/14: Update request

---

There was no response since then.
They never asked me if I was okay.
They never apologized...
...until I filed a lawsuit.

They must have thought that I was out of the country by then.
ODEA knew my F1 OPT expired by then.


        "When truth is replaced by silence, the silence is a lie."

                                        — Yevgeny Yevtushenko


128.    Recently I found out that Kaamilyah Abdullah-Span and Menah Pratt-Clarke were deeply involved in my case from the beginning along with M.T. Hudson and Heidi Johnson.

**(Evidence of their deep involvement is attached, marked as Exhibit H.)**

## SECTION C - Intentional Infliction of Physical, Mental Harm and Emotional Distress

**Closing**

129.     While I clearly know what the defendants have done wrong, I do not know exactly which path to take but I decided on filing a motion to request a counsel.  The defendants failed to comply with the followings:

Discrimination/Hostile Educational Environment, Title IX (Park v. BOT)
Denial of Substantive Due Process, 42 U.S.C. § 1983 (Park v. Stake, Hudson, & Johnson)
Denial of Substantive Due Process, 42 U.S.C. § 1983 (Park v. BOT)
Retaliation, 775 ILCS 5 et seq. (Park v. Hudson and Johnson)
Retaliation, 42 U.S.C. § 1981 (Park v. Hudson and Johnson)

130.     While the importance of preserving the doctrine of sovereign immunity should not be diminished, granting immunity to Defendants does not go with the intrinsic motivation of establishing sovereign immunity.

**Things are not going to change as long as immunity is bestowed on them**; by not granting sovereign immunity, public entities can be shielded in the long run, eventually protecting taxpayer's money;, which is ironically the purpose of the Tort Immunity Act.

131.     Defendants acted knowingly, intentionally, willfully, and maliciously in excluding me from their service by making a false statement, "Park was not a student or employee at the University of Illinois at the time of the investigation," which encouraged the culprits to continue belittling and retaliating against me, as well as other tortious behavior. Further, their continuous false statement has caused me to severe emotional distress and harm, all injuries of which have continued to the present date and will continue for decades into the future.

More specifically, as a result of Defendants' conduct, the damage done to me includes:

132.     Long-term physical and mental injuries including:

- Insomnia: The memories haunt me, I cannot simply erase the painful memories from my mind; I have gone through many sleepless nights. I often depend on sleeping pills.

- Trauma
- Depression
- Frequent, bulging headaches
- Esophagitis gastritis: Stomach and throat pain
- My heart pounds when I see someone who looks similar to my predators. (Trauma)
- Guilt, frustration, & anxiety: I feel guilty for not meeting my family's expectations and my expectations after spending 17 yrs in academia. I feel I failed in my career and am constantly sorry to myself and my family.  What can I do with my degree? I feel like my efforts for the last 18 years in the US turned out to be nothing.
- Shame & Humiliation: I'm ashamed and humiliated that I have been involved in (sexual) harassment and assault.
- Anger: I'm constantly angry when looking back at how I was belittled and shunned by my own school and the defendants.

133.    My quality of life has declined.

Social withdrawal: Inability to function. Scared to meet people. No motivation to meet people. Don't trust people. Stay home most of time, no social life. Talk to myself. I question the point of life and me continuing to live.

134.    Career prospects: My Future Career has been ruined

I was planning to publish my academic research with a good publisher, which takes quite some time. Due to the urgent situation of my risky legal status, I had to apply for NIW very quick. To succeed in my NIW petition, I had to have enough publications. So, I chose to self-publish several books within a short period of time through Amazon.

In academia, self-publication doesn't count. Right after getting a green card, I withdrew my self-publications except one. I am not proud of them. They need editorial work.

Once published, it is almost impossible to publish it again in a journal. My precious data I have collected for my five-year dissertation, the blood, sweat, and tears that went into it during my stay in the US since year 2000, the data that I consider my baby, may never be used in top journal publications in the future. I even discussed my situation with an AERJ (top journal in Education) editor who informed me that thechances of republishing my data was unfavorable.

135.	I do not know what to do. The ODEA's reckless actions and intervention led Secolsky to retaliate and attack me through dropping my H1 Visa process and removing my name in two journal authorships and the Handbook authorship, as well as the other academic work with him. I am sure that he spread his false story to the people in the academic community in the field of education. People may not care if what he said is true or not but it drastically affects me in a negative way. I haven't communicated with my colleagues since. As I mentioned, when I reached out several people who have known Stake and Secolsky to ask for help, they did not respond.

I strongly request and encourage that you look over the facts again, not the distorted facts taken out of context, in order for proper justice to be served and so I can move on with my life.

Thank you.

Best regards,

61

## V. PRAYER FOR RELIEF

Plaintiff requests that the Court grant the following relief:

1. Compensatory Damages in the amount of $ _3,000,000_ to compensate for *(check all that apply)*:

   - ☒ bodily harm
   - ☒ emotional harm
   - ☒ pain and suffering
   - ☒ loss of income
   - ☒ loss of enjoyment of life
   - ☐ property damage

   *All together*

2. Punitive Damages:  ☒ Yes  ☐ No

   *Make sure that others do not suffer as I have.*

3. Such injunctive, declaratory, or other relief as may be appropriate, including attorney's fees and reasonable expenses as authorized by 42 U.S.C. § 1988.

## DECLARATION UNDER FEDERAL RULE OF CIVIL PROCEDURE 11

I certify to the best of my knowledge, information, and belief, that this complaint is in full compliance with Rule 11(a) and 11(b) of the Federal Rules of Civil Procedure. The undersigned also recognizes that failure to comply with Rule 11 may result in sanctions.

Date: ___3 / 21 / 2018___

Signature of Plaintiff: _____

Plaintiff's Name *(print clearly or type)*: ___Hye-Young Park___

Mailing Address: ___101 Paddock Dr. E. Apt # A3___

City: ___Savoy___   State: ___IL___   Zip: ___61874___

Plaintiff's Telephone Number: ___(217) 766 - 4752___

email: hpark15hpark@gmail.com

7